UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
JOHN DOE,

                Plaintiff,

      v.

PRATT INSTITUTE,

                Defendant.

------------------------------------------------------------------------ X

Civil Action No.: 26-cv-03305

**<u>COMPLAINT</u>**

**Jury Trial Demanded**

Plaintiff John Doe[1] ("Plaintiff" or "John"), by and through his attorneys, Saland Law PC and Bushell, Sovak, Kane & Sash, LLP, as and for his Complaint against Defendant Pratt Institute ("Pratt" or the "University"), respectfully alleges as follows:

**<u>THE NATURE OF THIS ACTION</u>**

1.     This Title IX discrimination and related state law claims are brought on behalf of Plaintiff John Doe, a student currently enrolled and matriculated at Pratt Institute in Brooklyn, New York.

2.     Pratt found that John and his then-girlfriend Jane Roe consented to the sexual activity at issue.[2] Nevertheless, Pratt disciplined John for sexual assault.

3.     As discussed more fully below, during their 5-month relationship, John and Roe discussed and agreed to engaged in "sleeping sex", otherwise known as *dormaphilia*, the act of consensually commencing sex with someone while they are sleeping.

---

[1] Plaintiff files herewith a motion to proceed under a pseudonym. Although defendant agreed to accept service of the Summons and Complaint, it does not consent to plaintiff proceeding under a pseudonym.

[2] Jane Roe is a pseudonym. Pratt knows the identity of Jane Roe, John Doe, and the non-party student witnesses at issue.

1

4.     In violation of Title IX of the Education Amendments of 1972, Pratt engaged in a faulty process improperly influenced by John's male gender to reach an erroneous outcome regarding Roe's false claims.

5.     In violation of Title IX of the Education Amendments of 1972, Pratt selectively enforced its policies against John, a male student, and failed to do so in equal fashion against Roe, a female student.

6.     Pratt also treated John less well than Roe due to his male gender in violation of the New York City Human Rights Law, as well as the New York State Human Rights Law.

7.     Pratt took egregious, biased, intentional, and discriminatory actions against Plaintiff throughout the University's Title IX sexual misconduct process, which ignored the specific facts of the case and rushed to find Plaintiff responsible as a male accused.

8.     Roe brought forth false – and voluminous – allegations of sexual misconduct against Plaintiff following their consensual sexual encounters, and the University, notwithstanding the overwhelming evidence to the contrary, found against Doe even though it determined that Roe consented to the sexual activity at issue.

9.     As a result of the University's biased and flawed proceedings, Plaintiff was found responsible for nonconsensual sexual intercourse and was sanctioned.

10.    John has been greatly damaged by Pratt's actions, as his education and future career prospects have been severely compromised due to his disciplinary record as discussed below.

11.    Additionally, as a result of Pratt's actions and inactions, John has suffered emotional and reputational damages; economic injuries; and the loss of educational and career opportunities.

**THE PARTIES**

12. John Doe is a natural person and a resident of Rhode Island.

13. Pratt is a non-profit corporation duly organized and existing by virtue of the laws of the State of New York that conducts business in the State of New York.

**JURISDICTION**

14. This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337 because: (i) the claim herein arises under federal law and (ii) the state law claims are so closely related to the federal claims as to form the same case or controversy under Article III of the U.S. Constitution.

15. This Court has personal jurisdiction over Defendant because Defendant is a resident of the State of New York and conducts business within the State of New York.

16. Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**FACT ALLEGATIONS COMMON TO ALL CLAIMS**

**A. John and Roe in the Fall 2022 Semester**

17. John was a first-year undergraduate student at Pratt in fall 2022 when he met Jane Roe, also a first-year undergraduate student at Pratt. They were both legal adults at the time they met.

18. John and Roe entered into an intimate relationship in September 2022 and began dating and having sexual intercourse together in October 2022.

19.     In November and/or December 2022, after discussing and agreeing to try "sleeping sex", John and Rose in fact engaged in *dormaphilia*, the act of consensually commencing sex with someone while they are sleeping.

20.     John and Roe continued dating for a few more months and broke up on February 25, 2023, when, or on and about the time, Roe entered John's dorm room and they had an argument about John hanging out with her friends, Roe yelled and screamed at him threatened to punch him in the face and threatened to kiss his roommate.

B.  **Roe's Formal Disciplinary Complaint against John**

21.     On March 24, 2023, Roe submitted a formal complaint against John accusing him of sexual harassment, dating violence, retaliation, and sexual assault for events that allegedly occurred from November 2022 to January 2023 while they were dating.

22.     Specifically, Roe made twelve (12) allegations against John:

**Allegation #1**: In late November or early December 2022, at her off campus apartment, on multiple occasions, Doe rubbed his penis against Roe's buttocks while she was asleep.

**Allegation #2**: During late November or early December 2022, at Roe's parents' apartment, on approximately four or five occasions John engaged in sexual intercourse with her while she was asleep. During two of these occasions, John used his forearm to push against Roe's throat, causing her to be unable to breath and awake from the encounter.

**Allegation #3**: On some night in November 2022, while in Emerson Place Residence Hall, John engaged in non-consensual sexual intercourse with Roe while she was incapacitated due to alcohol consumption.

**Allegation #4**: On November 15, 2022, prior to sexual intercourse, Roe asked John to wear a condom for the full duration of intercourse, but he only wore one at the end upon ejaculation.

**Allegation #5**: During mid-December 2022, on three or four occasions while having sexual intercourse, Roe experienced pain and asked John to stop intercourse, but he did not remove his penis from her vagina and resumed intercourse again for a few minutes without her consent.

**Allegation #6**: On January 11, 2023, while in Rhode Island, prior to sexual intercourse, Roe asked John to wear a condom many times, but he engaged in sexual intercourse without a condom.

**Allegation #7**: On the night of January 14, 2023, in Roe's apartment, John engaged in sexual intercourse with her without her consent.

**Allegation #8**: Throughout their relationship, John smacked Roe's buttocks without her consent an estimated 50 times.

**Allegation #9**: John filed a counter-claim against Roe in retaliation to delay the completion of her complaint against him.

**Allegations #10-12**: Roe made three more allegations against John but Pratt preliminarily dismissed them because those claims did not alleged conduct that, if true, would constitute covered sexual harassment or retaliation.

23.     Prior to Roe's complaints, John had no disciplinary history and there were no other allegations involving similar conduct for which he was found responsible.

### C. Relevant Sexual Misconduct Policy Provisions

24.     At all times relevant to this matter, Pratt had a sexual misconduct policy in place.

25.     At no time relevant to this proceeding did Pratt have a policy or prohibition against "sleeping sex." Similarly, Pratt had no policy regarding other sexual proclivities or fantasies, including, *inter alia*, BDSM or other fetishes.

26.     Pratt defines "affirmative consent," in relevant part, as a "a knowing, voluntary, and mutual decision among all participants to engage in sexual activity." Further,

"incapacitation" under its policy is defined, in relevant part, as "A person is incapacitated when then person cannot make a rational, reasonable decision because the person lacks the ability to understand their decision." *Id.*

**D. The Title IX Disciplinary Hearing against John**

27.     As a result of Roe's formal complaint against John, Pratt scheduled three days of hearing on April 25, 2024, June 18, 2024, and June 20, 2024. According to Pratt's rules, John is presumed not responsible, and the burden of proof (preponderance of the evidence) is on Roe.

28.     On April 25, 2024, the original three hearing panel members (Alan Canterbury, Ziggie Brown and Jasmine Cuffie) heard opening statements of the parties. During a break, however, it was discovered that one of the hearing members would not be able to fulfill her obligations to serve for the full duration of the hearing. At that point, the hearing was adjourned to retain a new member to serve on the hearing panel. During that recess, it was determined that yet another member of the panel needed to be replaced.

29.     The hearing continued on June 18, 2024 and June 20, 2024 with two new members on the panel. Prior to the continued hearing, the two members reviewed the video recording of the proceedings that occurred on April 25, 2024, including the opening statements by both parties.

30.     The revised panel thereafter heard accounts from both parties and six witnesses, asked questions about the information contained in the investigation report, and provided opportunities for the parties' advisors to ask questions of the other party and witnesses. The hearing concluded on June 20, 2024 with closing instructions from the hearing panel.

**E. The Title IX Hearing Panel Decision**

31.     On August 1, 2024, the hearing panel found that (a) John and Roe met in the fall 2022 semester, when they were both first-year students at Pratt, (b) Roe was the roommate of one of John's close friends, (c) Doe and Roe entered into an intimate relationship early in the fall semester and, in October 2022, they began having sexual intercourse together, (d) on February 25, 2023, the parties broke up and, on that same day, Roe "entered [John's] residence hall, yelled and screamed at [him], threatened to punch [him] in the face, and threatened to kiss his roommate," and (e) a few weeks later, Roe submitted a formal complaint against John alleging sexual assault and other violations of Pratt's policies.

32.     The hearing panel further found that John was not responsible on all counts except one – it concluded that John sexually assaulted Roe because he engaged in "sleeping sex" with Roe in November and/or December 2022 and, *inter alia*, suspended him for one semester. The panel also found that Roe *consented* to the "sleeping sex."

33.     The hearing panel's conclusion was incongruous with its findings that Roe consented to "sleeping sex": "[a]t some point in time not the same day as the sexual intercourse happened, [Roe] agreed to let [John] have intercourse with her while she slept."

34.     The hearing panel "recognized [Roe] gave [John] explicit written permission to [John] to engage in sex with her while she was asleep (via the text message), that consent can also be withdrawn at any time, and the distance in time between when [Roe] gave consent for sex in her sleep to when it actually happened was unknown but it was at least more than one day, which was too long of a gap for [Roe's] consent to be effective and affirmative because [John] did not know whether she had withdrawn her consent when he initiated sex with her."

35.     The hearing panel found both John and Roe to not be credible witnesses but did find that Roe affirmatively consented to "sleeping sex" beforehand in writing via a text message and thereafter acknowledged that she consented to the "sleeping sex" in a handwritten letter written the day after her and John broke up in February 2023.  Her consent was further corroborated through testimony from Doe and Roe's mutual female friends.

36.     John argued during the hearing that if it was the case that he needed to wake up Roe before initiating sex, that would defeat the purpose of what they had agreed to do while they were in a committed relationship, and essentially make sex with someone in their sleep a strict liability violation even though it was consented to between parties that had been dating for months. The hearing panel admittedly did not address this argument.

37.     Instead, the hearing panel conceded that although "there may be some amount of time between [Roe] providing prospective consent and [John] initiating sexual activity that was small enough for [Roe's] consent to remain effective and affirmative," "an unknown amount of time more than a day was too long for the hearing panel to make that finding here." This decision grounded on a newly-created "more than one day" theory was made up and, as discussed below, later modified.

38.     Pratt had no policy on "sleeping sex," and the hearing panel's factual findings about Doe disprove that he violated its Affirmative Consent ("Consent") policy which states that consent is: "a knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity. Silence or lack of resistance does not in and of itself, demonstrate consent  . . . Consent to any sexual act or prior

8

consensual sexual activity between or with any party does not necessarily constitute consent to any other sexual act . . . Consent may be initially given but withdrawn at any time."

39. The hearing panel acknowledged that Roe and John made a knowing, voluntary, and mutual decision to engage in "sleeping sex," and this was confirmed by Roe in writing both before and afterwards and corroborated by third parties.

40. The hearing panel simply created a new rule on the spot and applied its new Consent Policy holding that "an unknown amount of time more than a day was too long for" prospective consent to "sleeping sex" (the "One-Day Rule"). Setting aside the fact that Pratt made up the One-Day Rule on an *ad hoc* basis, the One-Day Rule is neither grounded in Pratt's written Consent policy nor based on any agreement between Roe and John.

41. Pratt's creation of this new rule was based on anti-male bias in that (a) it assumes that John, the male, no longer had consent from Roe without any evidence to the contrary, (b) seeks to protect Roe from a non-existent harm, while punishing John for engaging in behavior that Roe consented to, and (c) punishes John for "sleeping sex," but not Roe who also voluntarily engaged in it.

42. John timely appealed the decision to Pratt's appellate panel on August 21, 2024 arguing, among other things, that there were procedural irregularities that affected the outcome of the matter and/or the sanction was objectively unreasonable in light of the facts and circumstances.

**F. The Title IX Appeal Panel Decision**

43. On October 1, 2024, the appeal panel notified John of its decision.

44. The appeal panel modified the hearing panel's decision in two material ways.

45. First, it abandoned the One-Day Rule established for the first time by the hearing panel. However, the appeal panel created a new categorical rule and held that "sleeping sex," *ipso facto,* cannot be consented to and that John *and* Roe "intended to violate the policy" by agreeing to engage in same. Further, it retroactively applied this new rule to John. Like the hearing panel before it, Pratt created a new rule on the spot and applied it to John, but not Roe.

46. That is, the University concocted a new claim/rule in connection with its Title IX policy and found only John liable, even though it found that both John and Roe acted in concert to violate the University's policy against "sleeping sex" which never existed before.

47. The appeal panel stated that "[John] cites a text message and the letter from [Roe] as support of his assertion of consent, but rather this evidence proves that the parties intended to violate the policy. Both [John and Roe] testified that following their communication(s) on "sleeping sex", [John] penetrated [Roe] while she was sleeping. This testimony is an admission of violating the policy, and we therefore do not see any procedural irregularities that affected the outcome."[3]

48. The panel continued that "[John and Roe's agreement] on its face is a violation of the policy. The policy explicitly outlines that '*Someone who is incapacitated cannot consent. A person is incapacitated when the person cannot make a rational, reasonable decision because the person lacks the ability to understand their decision. A person can become incapacitated as a result of, among other things, physical or mental impairment, involuntary physical constraint, **sleep, unconsciousness**, or consumption of alcohol or other drugs.*'" (Emphasis in original) However, no one argued (or is arguing) that a person incapable of making a rational decision can

---

[3] Again, it must be noted that the appeal panel found that both John *and* Roe "intended to violate" the newly created *ad hoc* policy prohibiting "sleeping sex" but only sanctioned John for same.

consent to sex. Rather, here, the "sleeping sex" was found to be consented to by Roe while she was fully capable of making that decision.

49. Second, the panel lowered John's sanction. It vacated his suspension finding it "objectively unreasonable under the circumstances" and modified the sanction to (a) social probation until May 25, 2025, (b) suspension from Pratt housing until May 25, 2025, and (c) the completion of the 90-minute online course entitled "Sexual Assault Prevention Ongoing – Healthy Relationships."

50. The appeal panel's decision was the final decision issued by Pratt on this matter.[4]

### G. Pratt's Anti-Male Bias in its Handling of Roe's Title IX Complaint Against John via Selective Enforcement and On-the-Fly Application of New Policies

51. In the 2020s, coming after the #MeToo movement, schools like Pratt do not operate in a vacuum and arguably enacted more stringent and comprehensive victim-centered policies and procedures for resolution of sexual assault complaints in order to address the renewed pressure to make findings of responsibility against males accused of sexual assault for on-campus activities.

52. Pratt, like its peer schools through New York and the rest of the country, has come under pressure for the way it handles sexual assault, and in particular sexual assault against females.

53. Faced with a matter involving its students engaging in *dormaphilia* – something not covered under its policies – and accusations of sexual misconduct, Pratt was motivated to

---

[4] An Article 78 proceeding was filed in Supreme Court, Kings County, seeking to overturn the appeal panel's decision on the basis that Pratt misapplied its relevant policies against John by acting in an arbitrary and capricious manner. That proceeding was dismissed by the trial court and is currently on appeal in the Second Department, fully briefed, awaiting a date for oral argument.

favor Roe, as the female accuser, instead of John, the cisgendered male respondent because it did not want to draw scrutiny that it failed to protect female students from assault or to take the complaints of female students seriously.

54. Pratt sought to create an image that it was "tough" on sexual violence and refrained to dismissing Roe's complaint in its entirety even though it found that Roe consented to the sexual activity at issue.

55. In other words, John's behavior, though indisputably not running afoul of Pratt's Title IX policy and consented to by Roe in writing both before and after, had to be deemed sexual assault simply because Roe filed a complaint. This is anti-male bias.

56. Further, although Pratt found that both Roe and Doe conspired to violate Pratt's unwritten and unknown policy against "sleeping sex," it only sanctioned Doe using an anti-male bias that Roe was blameless when it comes to sexual activity.

57. As discussed, the hearing panel seemingly updated its Title IX policies on-the-fly during the adjudication of John's case before it by applying a One-Day Rule to its Consent Policy so it can find him culpable.

58. That is, Pratt, via its hearing panel, rushed to find John responsible against the undisputed evidence that Roe consented to the sex at issue.

59. Perhaps sensing the unease in which of Pratt's initial ruling against John was handed down, the appeal panel revoked his suspension and substituted in with a reduced punishment hoping that John would simply accept the inequity and move on.

60. Regardless of the merits of each individual case, the University never wants to be viewed as not believing someone alleging sexual assault. Therefore, even though it found that Roe consented and that she was not a credible witness, it nevertheless determined that John

sexually assaulted Roe. Pratt needed to punish Doe for optics despite the fact that Doe was completely innocent.

61. Nevertheless, Pratt enforced the appeal panel's newly created policy retroactively against John and only John even though both he and Roe were found to have acted in concert to violate the Consent policy.

62. Pratt did not enforce its Title IX policies against Roe.

63. Pratt enforced its Title IX policies against John.

64. Pratt's actions during the Title IX process were also indicative of gender bias.

65. Upon information and belief, Pratt has conducted gender-biased investigations, applied unfair procedures, and imposed disproportionate sanctions against male students accused of misconduct.

**H. Damages**

66. As a direct and proximate result of the suspension, John sustained damages, including, without limitation, emotional distress, reputational damages, loss of education and career opportunities, economic injuries, and other direct and consequential damages.

67. John's future career may be jeopardized by Pratt's appeal panel decision.

68. Pratt's actions have caused John to suffer from mental anguish, sleep disturbance, emotional distress, loss of self-esteem, loss of friends and community, loss of personal and lifelong ambitions.

69. Pratt's actions have caused significant financial damages to John and his family.

<strong><u>AS AND FOR A FIRST CAUSE OF ACTION</u></strong><br>
<strong>Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 <em>et seq.</em></strong><br>
<strong>(Erroneous Outcome)</strong>

70. Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

71. Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

72. Title IX of the Education Amendments of 1972 applies to an entire school or institute if any part of that school receives federal funds.

73. Pratt, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a).

74. John and Roe were similarly situated male and female students in the circumstances of this case.

75. Both were freshmen students at the same school, subject to the same Title IX policies.

76. Both filed formal Title IX complaints against one another and the matters were heard at the same time.

77. John provided hundreds of text messages, videos, and witness testimonies to support his claims that Roe sexually harassed him and engage in dating violence during their brief relationship. He also provided written evidence that Roe consented to "sleeping sex" both before and afterwards.

14

78. Pratt's disciplinary process produced an erroneous outcome unsupported by evidence. The panel ignored corroborating proof of consent, created new rules mid-process, and applied them retroactively. These irregularities reflect gender bias and led to a wrongful finding of responsibility.

79. Unlike the typical he-said/she-said, John provided objective evidence to support his claims against Roe.

80. Yet, the evidence did not favor Pratt's intended outcome, so they treated the same set of facts very differently for the male and female student.

81. Both were found, on appeal, to have committed sexual misconduct violations that were against the University's Consent Policy.

82. Numerous evidentiary and procedural errors occurred throughout the Title IX process, resulting in an erroneous outcome including discarding Roe' admissions that the sex was consented to and applying an *ad hoc* Title IX policy against Doe because of his gender (while not applying that same newly-created policy to Roe).

83. Under Title IX, an educational institution must develop, implement, and execute a hearing procedure that is substantially fair in nature.

84. Challenges to university disciplinary proceedings on the basis of "erroneous outcome" assert that the plaintiff was innocent and was wrongly found to have committed an offense and that gender bias was a motivating factor behind the erroneous findings.

85. An erroneous outcome occurred in this case because John was innocent and wrongly found responsible for sexual assault (on appeal, acting in concert with the complainant to violate "sleeping sex" Consent Policy) and gender bias was a motivating factor.

86. Pratt reached conclusions that were incorrect and contrary to the weight of the evidence insofar as even though both John and Roe were found not credible.

87. Despite overwhelming evidence that Roe's Title IX complaint was unfounded in its entirety, Pratt would not dismiss her Title IX complaint outright and made a tremendous effort, both in the initial hearing and later on appeal, to rule in favor of Roe, in a one-sided fashion, so that John could be held responsible for sexual misconduct because Pratt assumed that a male must be liable for sexual assault if any complaint is made even if they determine that the complainant was not credible and consented to the sexual conduct. Put another way, once a complaint is made, no matter how implausible or lacking in evidence, someone needs to be disciplined.

88. Based on the foregoing, Pratt rendered an incorrect decision.

89. Pratt repeatedly violated its own policies by rewriting them on-the-fly so that it could find John culpable in connection with Roe's Title IX complaint.

90. The anti-male bias is evident seeing as the conduct of John did not meet the requirements of Pratt's sexual misconduct policy.

91. Pratt failed to act in accordance with its own policies that were designed to protect accused students.

92. Pratt misapplied its own policies and procedures when it found John responsible for sexual assault.

93. Pratt's finding that John was responsible for sexual assault in contravention of its own policies and without evidence (or policy) to support such a finding constituted an erroneous outcome.

16

94. Pratt applied its policies and procedures in a manner that discriminated against John, and gender bias was a motivating factor.

95. Allegations of a flawed proceeding support a claim of an erroneous outcome.

96. Pratt engaged in a flawed proceeding when it sought to justify finding John culpable for sexual assault in any possible way, both at the initial hearing and later on appeal.

97. Pratt found only John responsible despite (i) dismissing all of Roe's other allegations, (ii) finding Roe not credible, (iii) finding that both John and Roe consented to the sex, and (iv) that they were equally culpable for acting in concert to violate the University's *ad hoc* policy against "sleeping sex."

98. Based on the foregoing, Pratt failed to properly apply the preponderance of the evidence standard by failing to assess the entirety of the evidentiary record, ignoring exculpatory evidence in John's favor, rewriting University policy concerning sexual conduct/misconduct on-the-fly, and rendering a one-sided determination.

99. Based on the foregoing, Pratt improperly assumed that Roe was a victim of sexual misconduct.

100. As discussed above, pressure on Pratt, as with other universities, to vindicate female survivors alleging sexual misconduct caused the University to subject Plaintiff John Doe to a biased and unfair process, which was tilted in favor of the cisgendered female and against him, the cisgendered male.

101. Based on the foregoing, John Doe was subjected to a biased, prejudiced, and unfair process in violation of Title IX designed to find him, the cisgendered male, responsible for sexual assault and be punished for it.

102. This unlawful discrimination in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.***
**(Selective Enforcement)**

103. Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

104. In "selective enforcement" Title IX cases, a Plaintiff can challenge a university disciplinary outcome by asserting that regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

105. In the instant matter, the University subjected John Doe to disparate treatment in comparison to Jane Roe – a similarly situated female – and imposed a more severe sanction upon him for consensual sexual conduct.

106. Pratt consolidated John's claims against Roe and Roe's claims against John into one investigation because they stemmed from the same alleged incidents.

107. John and Roe were similarly situated because they were both complainants and respondents.

108. At the end of the investigation and hearing, as explained above, Pratt found John responsible for only one allegation set forth by Roe against him. Conversely, Pratt did not find Roe responsible for any violations whatsoever even though she was deemed to have acted alongside John to violate University policy.

18

109. There are numerous circumstances demonstrating the University's partiality towards Roe as the female accuser, and against John as the male accused.

110. That is, despite finding neither John nor Roe to be credible witnesses, the pressure on universities during the immediate #MeToo years to protect female students paved the way to find cisgendered male students responsible for accusations of sexual misconduct, even where the evidence suggested otherwise.

111. Pratt found only John responsible despite (i) dismissing all of Roe's other allegations, (ii) finding Roe not credible, (iii) finding that both John and Roe consented to the sex, and (iv) that they were equally culpable for acting in concert to violate the University's *ad hoc* policy against "sleeping sex."

112. Conversely, despite finding John's accusations plausible, the panel found that they did not rise to level to the preponderance of the evidence to support findings of sexual harassment and dating violence.

113. Pratt applied its policies and procedures in a manner that discriminated against John, and gender bias was a motivating factor.

114. Pratt engaged in a flawed proceeding when it sought to justify finding John culpable for sexual assault in any possible way, both at the initial hearing and later on appeal.

115. Based on the foregoing, John Doe was subjected to a biased, prejudiced, and unfair process in violation of Title IX designed to find him the cisgendered male, responsible for sexual assault and punish him for it.

116. Pratt discriminated against Doe on the basis of sex by punishing only him for conduct that Roe equally engaged in. The decision was motivated by gender stereotypes portraying male students as aggressors and female students as victims.

19

117. This unlawful discrimination in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Violation of Executive Law § 296(4)**
**(New York State Human Rights Law)**

118. Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

119. Defendant Pratt is an educational corporation and operating as such under the laws of the State of New York.

120. The New York State Human Rights Law § 296(4) provides: "[i]t shall be an unlawful discriminatory practice for an education corporation or association ... to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, military status, sex, age, or marital status[.]"N.Y. Exec. Law § 296(4).

121. Pratt engaged in a biased and discriminatory Title IX process against John Doe as a result of his male gender.

122. Based on the foregoing, Pratt permitted discrimination against John Doe on the basis of sex.

123. Based on the foregoing, Pratt authorized, condoned, and/or acquiesced to discriminatory conduct against John Doe.

124. Based on the foregoing, Pratt knew or should have known of such discriminatory conduct and failed to undertake action to prevent it.

125. Defendant Pratt engaged in the following discriminatory acts or practices against John Doe, as the male accused: Pratt subjected John Doe to disciplinary action in a discriminatory way, and in discrimination against him on the basis of his gender, Pratt failed to adhere to its Consent policy; the decision(s) rendered were discriminatory in that, given the evidence (or lack thereof), the only possible way to reach the decision(s) was a discriminatory bias against males.

126. Based on the foregoing facts and circumstances, Pratt engaged in unlawful, discriminatory practices in violation of N.Y. Exec. Law § 296(4). Pratt discriminated against Doe on the basis of sex in violation of the NYSHRL by selectively enforcing policies, subjecting him to biased procedures, and imposing unequal discipline.

127. As a direct and proximate consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

### AS AND FOR A THIRD CAUSE OF ACTION
**Violation of Civil Rights Law § 40-c(2)**
**(New York City Human Rights Law)**

128. Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

129. Pratt engaged in a biased and discriminatory Title IX process against John Doe as a result of his male gender.

130. Based on the foregoing, Pratt permitted discrimination against John Doe on the basis of sex.

131. Based on the foregoing, Pratt authorized, condoned, and/or acquiesced to discriminatory conduct against John Doe.

132. Based on the foregoing, Pratt knew or should have known of such discriminatory conduct and failed to undertake action to prevent it.

133. Defendant Pratt engaged in the following discriminatory acts or practices against John Doe, as the male accused: Pratt subjected John Doe to disciplinary action in a discriminatory manner, and in discrimination against him on the basis of his gender, Pratt failed to adhere to its Consent policy; the decision(s) rendered were discriminatory in that, given the evidence (or lack thereof), the only possible way to reach the decision(s) was a discriminatory bias against males.

134. Based on the foregoing facts and circumstances, Pratt engaged in unlawful, discriminatory practices in violation of the New York City Human Rights Law. Doe was sanctioned and stigmatized solely because of his gender, while Roe was excused.

135. As a direct and proximate consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Pratt as follows:

(i) On the first cause of action for violation of Title IX of the Education Amendments of 1972 (erroneous outcome), a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and

disbursements, as well as injunctive relief directing Pratt to: (i) reverse the outcome, findings, and sanction regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe matter; (iii) remove any record of the Roe finding or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante;

(ii)     On the second cause of action for violation of Title IX of the Education Amendments of 1972 (selective enforcement), a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Pratt to: (i) reverse the outcome, findings, and sanction regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe matter; (iii) remove any record of the Roe finding or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante;

(iii)    On the third cause of action for New York State Human Rights Law § 296(4), a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

23

(iv)      On the fourth cause of action for New York City Human Rights Law, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, punitive damages, costs, and disbursements

(v)      Such other and further relief as the Court deems just and proper.

## JURY DEMAND

John Doe herein demands a trial by jury of all triable issues in the present matter.

Dated: New York, New York
      June 2, 2026

Bushell, Sovak, Kane & Sash LLP

By:_*Alan E. Sash*_____
Alan E. Sash
274 Madison Avenue, Suite 1401
New York, New York 10016
(212) 949-4700
asash@bushellsovak.com

Saland Law PC
Jeremy Saland
274 Madison Avenue, Suite 1401
New York, New York 10016
(212) 312-7129
jsaland@salandlaw.com